IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

HOWARD ROSS, JR.,

    **Plaintiff,**

v.                             Civil Action No. 1:05-0561

PENNSYLVANIA MANUFACTURERS
ASSOCIATION INSURANCE COMPANY,

    **Defendant.**

<u>MEMORANDUM OPINION</u>

    Pending before the court are cross motions for summary judgment.  (<u>See</u> Doc. Nos. 19 & 21) and defendant's motion for summary judgment regarding its counterclaim (Doc. No. 23).  For the reasons outlined below, in an accompanying Judgment Order, plaintiff's motion for summary judgment (Doc. No. 19) is denied, defendant's motion for summary judgment (Doc. No. 21) is granted, and defendant's motion for summary judgment regarding its counterclaim (Doc. No. 23) is denied.  Additionally, for the reasons outlined below, the court dismisses defendant's counterclaim (Doc. No. 8) in its accompanying Judgment Order.  Finally, the accompanying Judgment Order directs the Clerk to remove this case from the active docket of the court.

## I.  Factual and Procedural Background

### A. Medical Background

    On or about September 4, 2000, plaintiff Howard Ross, Jr. was verbally attacked and threatened with physical harm by the

finance manager of a car dealership in Bluefield, West Virginia. (See Administrative Record, hereinafter "R.," at 153, 203.) Following the attack, plaintiff suffered chest pain, shortness of breath, and passed out twice, once while walking up the stairs of his home. (See R. at 153, 233, 342.)

Plaintiff was evaluated at St. Luke's Hospital in Bluefield, West Virginia, on September 4, 2000, and had a heart catherization at Duke University on September 18, 2000. (See R. at 136, 139-40.) On November 3, 2000, plaintiff underwent a psychiatric evaluation with Dr. Riaz at the Bluefield Mental Health Center in Bluefield, Virginia. (R. at 70.) Dr. Riaz diagnosed plaintiff with Post Traumatic Stress Disorder ("PTSD") as a result of a violent incident and major depression. (R. at 72.) Plaintiff was treated by Dr. Riaz with outpatient psychotherapy and various medications. (R. 70-94.)

At some time after the incident, plaintiff began experiencing constant neck pain, right shoulder pain, and numbness in his hands. (See R. 233, 263, 267, 269, 274, 357.) On April 18, 2003, plaintiff was operated on by Dr. Gordon R. Bell, the head of the Section of Spinal Surgery at the Cleveland Clinic to remove anterior cervical hardware and perform a diskectomy at C7-T1 due to the migration of hardware resulting from C-spine surgery occurring in July 2002. (See R. at 141, 260, 346.)

-2-

## B.  Procedural Background

At the time plaintiff was attacked in the car dealership, he was employed by Avis Construction Company, Inc. ("Avis") of Roanoke, Virginia, as a field superintendent.  Through his employment with Avis, plaintiff was a participant in an employee welfare benefits plan insured by Pennsylvania Manufacturers Association Insurance Company ("PMA"), under Group Insurance Policy Number 100162 ("Policy").  Subject to certain exceptions, PMA has the sole authority to manage the Policy, to administer claims, to interpret Policy provisions, and to resolve questions arising under it.  (See R. at 379.)  Under the Policy, disability is only covered from injuries occurring while a participant is covered under the plan.  (See R. at 377-78.)  However, disability is not covered when it occurs at a later date.  (R. at 388.)  The Policy also requires claimants to provide proof of any claims under it at their own expense.  (See R. at 401.)

Plaintiff began receiving payments under the Policy on or about March 19, 2001, due to his depression and PTSD.  (R. at 57-59.)  In February 2003, PMA terminated plaintiff's long-term disability benefits, noting that there is a twenty-four month limited pay period for mental nervous conditions under the Policy.  (R. at 125-48, 289-92.)  On March 25, 2003, plaintiff appealed PMA's decision terminating his claim for long-term disability benefits.  (R. at 187, 193-95, 289-92.)

-3-

In the record, on January 13, 2003, someone at PMA noted that plaintiff's neck injury allegedly resulted from the September 4, 2000, incident.  (R. at 343.)  PMA subsequently recognized that, if this was true, plaintiff could be able to make a claim for physical disability that would not be limited to twenty-four months as was his claim for mental disability.  (R. at 343-44.)

On April 1, 2003, and April 3, 2003, PMA made written requests for plaintiff to provide specific medical records to it so that it could conduct a review of his claim.  (See R. at 208-11.)  On May 7, 2003, PMA determined that plaintiff was not eligible for long-term disability benefits past the twenty-four month mental illness limitation, and no exceptions applied to him.  (See R. 217-19.)  However, the letter also indicated that

> The Committee is . . . exercising its right
> to extend the time to review and make a
> determination regarding [plaintiff's]
> comments about a head injury . . . . The
> reason for this extension is because of
> special circumstances and tolls the 45 day
> time period to make a determination regarding
> the claim . . . . [Pursuant to ERISA,] you
> may expect to receive a determination within
> 45 days from the date of this letter.

(R. at 219.)

Plaintiff notes that

> PMA had been in contact with
> [plaintiff's] counsel and was aware of the
> difficulty both [it] and [plaintiff's]
> counsel [were] having in obtaining
> [plaintiff's] medical records, especially

> those of Dr. Koja.  On May 14, 2003, PMA
> mailed a medical request directly to Dr.
> Koja's office, but did not receive the
> requested medical records as of May 27, 2006.

(See Doc. No. 20 at 4-5) (discussing R. at 353-57.)

On May 28, 2003, PMA's Appeals Committee ("Committee")
reviewed plaintiff's long-term disability claim regarding his
neck injury.  (See R. 356-57.)  The Committee's notes indicate
that PMA, on at least two occasions, had notified plaintiff's
attorney that more medical records were needed, and that no such
medical records had been provided.  (R. at 357.)

Plaintiff notes that, on June 17, 2003, his counsel mailed
PMA medical documentation supporting his disability claim on his
neck injury.  (See R. at 225-81.)  Plaintiff indicates that among
these records was information from the Cleveland Clinic and the
Know Pain Clinic, d/b/a The Pain Management Centers of the
Virginias.  Plaintiff also notified PMA that plaintiff's counsel
was making continued attempts to obtain medical records from Dr.
Koja.  (See Doc. No. 20 at 5.)  Plaintiff maintains these records
indicate that plaintiff's neck injury became symptomatic shortly
after the September 4, 2000, incident where plaintiff blacked out
and fell and hit his head.  (See id.) (discussing R. at 233, 263,
269, 274, 357.)

## II.  Standard of Review

A motion for summary judgment may be granted when there are
no genuine issues of material fact and the movant is entitled to

a judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Matsushita</u>
<u>Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88
(1986).  Summary judgment is appropriate when the nonmoving party
has the burden of proof on an essential element of his case and
does not make, after adequate time for discovery, a showing
sufficient to establish that element.  <u>Celotex Corp. v. Catrett</u>,
477 U.S. 317, 322-23 (1986).  The nonmoving party must satisfy
this burden of proof by offering more than a mere "scintilla of
evidence" in support of their position.  <u>Anderson v. Liberty</u>
<u>Lobby, Inc.</u>, 477 U.S. 242, 252 (1986).

     In reviewing an ERISA claim for the denial of benefits, the
court must apply a de novo standard unless the benefit plan
provides the plan administrator or fiduciary with the
discretionary authority to determine eligibility for benefits or
to construe the terms of the plan.  <u>Firestone Tire & Rubber Co.</u>
<u>v. Bruch</u>, 489 U.S. 101, 115 (1989).  If the Plan provides the
plan administrator with discretionary authority, the court
applies an "abuse of discretion" standard, and will not disturb
the denial of benefits if the decision is objectively reasonable
and based upon substantial evidence.  <u>Firestone</u>, 489 U.S. at 111;
<u>Ellis v. Metro Life Ins. Co.</u>, 126 F.3d 228, 232 (4th Cir. 1997).
The Plan at issue in this case gives its fiduciary discretionary
authority to determine eligibility.  (<u>See</u> R. at 379) ("providing
that 'Except for those functions which this policy specifically

-6-

reserves to the Policyholder or Employer, [PMA] has sole
authority to manage this Policy, to administer claims, to
interpret policy provisions, and to resolve questions arising
under this policy . . . . Any decision [PMA] makes in the
exercise of its authority shall be conclusive and binding'").

Under Fourth Circuit precedent, when the plan administrator
operates under a conflict of interest, the court modifies the
abuse of discretion standard.  See Doe v. Group Hosp. & Med.
Servs., 3 F.3d 80, 84 (4th Cir. 1995); Booth v. Wal-Mart Stores,
Inc., 201 F.3d 335, 343 (4th Cir. 2000) (holding that a conflict
of interest "*must* be weighed in determining whether there is an
abuse of discretion.").  The fiduciary decision will be entitled
to some deference, but this deference is lessened "to the degree
necessary to neutralize any untoward influence resulting from the
conflict."  Doe, 3 F.3d at 87.  Under this sliding-scale standard
of review, the more incentive for the administrator or fiduciary
to benefit itself by a certain interpretation of benefit
eligibility, "the more objectively reasonable the administrator
or fiduciary's decision must be and the more substantial the
evidence must be to support it."  Ellis, 126 F.3d at 233.

In Browning v. A.T. Massey Coal Company Employees'
Comprehensive Benefit Plan, No. 2:00-0461, 2002 WL 1822931, at *3
(S.D. W. Va. June 26, 2002) (Goodwin, J.), the court found that a

modified abuse of discretion standard was appropriate for the plan.  Therein, the court noted that

> Here, the Plan is funded by A.T. Massey, appoints A.T. Massey as its fiduciary, and is administered by the Benefits Committee, which is a division of A.T. Massey.  The mailing address for the Benefits Committee is listed at the same address as A.T. Massey, and the Plan provides that all correspondence should be mailed to the Benefits Committee c/o A.T. Massey.  All voting members on the Benefits Committee are either employees of A.T. Massey or employees of one of its subsidiaries. Under these circumstances, the court finds that a conflict of interest is present and will weigh that factor in determining whether there was an abuse of discretion, and accord less deference to the administrator's decision to the degree necessary to neutralize any untoward influence resulting from the conflict.

See id. (citing cases) (internal citation omitted).

     Here, the parties note that the same company pays claims and administers the Policy.  (See Doc. No. 20 at 18; Doc. No. 27 at 1.)  As such, the court will review the claims with a lesser degree of deference than it would if this case were free of any indicia of possible conflict of interest.

### III.  Cross-Motions for Summary Judgment

     Defendant notes that the standard of review applicable to this situation requires the court to defer to the decision of the plan administrator so long as the decision is "reasonable, even if the court itself would have reached a different conclusion." (Doc. No. 22 at 7) (quoting Booth v. Wal-Mart Stores, Inc., 201

F.3d 335, 344-45 (4th Cir. 2000)).  In <u>Booth</u>, the court stated that, in determining whether a decision is "reasonable," a reviewing court should focus on: (1) the adequacy of the materials considered to make the decision and the degree to which they support it; and (2) whether the decision-making process was reasoned and principled.  201 F.3d at 344-45.  The <u>Booth</u> court focused on the degree to which the administrative record supports the plan's decision.

In this case, PMA's decision appears to be both principled and reasonable.  In its May 7, 2003, letter to plaintiff, PMA indicated that "the medical records submitted from Dr. Koja do not contain sufficient information to indicate relationship between the neck surgery of 2002; and the incident of September 2000."  (R. at 219.)  PMA requested that plaintiff send records from Dr. Koja, "including his records prior to surgery"; "any notes prior to November 2000 from Harry Hirsh, M.D."; and "all notes from Cleveland Clinic."  (R. at 219.)

Plaintiff references a number of pieces of evidence in his memorandum supporting his motion for summary judgment.  (<u>See</u> Doc. No. 20 at 6.)  Plaintiff indicates that he has presented evidence illustrating this connection.  The court's review of the evidence indicates that he has not, and as such, his first argument must be rejected.

Plaintiff indicates that, on September 4, 2000, he was "evaluated at St. Luke's Hospital in Bluefield, West Virginia." (Doc. No. 20 at 1.)  The records from that day relate to plaintiff's complaints of chest pain and shortness of breath, and make no mention of a head or neck injury.  (<u>See</u> R. at 139-40.) The first records from St. Luke's that mention any such thing are from July 30, 2002, and discuss plaintiff's anterior cervical diskectomy and fusion at C6-7.  (<u>See</u> R. at 141-42.)  For what it is worth, this document notes that plaintiff's history of neck pain is "longstanding."  (R. at 141.)

Although plaintiff indicates that there is evidence supporting the claim that his neck injury originated in September 2000, none of the documents plaintiff references reflect treatment for a cervical injury in the September 2000 time period.  (<u>See</u> R. at 223) (a report from the Know Pain Clinic dated July 11, 2002); (R. at 263-64) (a report from the Cleveland Clinic dated March 31, 2003); (R. at 267-69, 273-76) (same, dated January 16, 2003).[1]  Similar statements appear in letters written by plaintiff or his counsel during the course of the claims review process.  (<u>See</u> R. at 153) (letter from plaintiff to the West Virginia Insurance Commissioner dated April 1, 2003); (R. at

---

[1]  These are the documents plaintiff submitted on June 17, 2003, and discussed in plaintiff's brief supporting his motion for summary judgment.  The earliest of these records dates from 2002.

357) (PMA lognotes describing letter from plaintiff's counsel to
PMA dated June 20, 2003).

The only statement by a doctor, other than the one
referenced above, that connects plaintiff's neck injuries to the
2000 time period is a statement by one of plaintiff's attending
physicians, Dr. Bendy, indicating that plaintiff's cervical spine
symptoms first appeared on December 29, 2000, and that he was
treated on this date.  (See R. at 167-68.)  This statement,
though, was completed on March 28, 2003, and no records document
Dr. Bendy's treatment of plaintiff around December 2000.

It is clear that plaintiffs have the burden of establishing
that they are disabled under ERISA.  See Elliott v. Sara Lee
Corp., 190 F.3d 601, 603 (4th Cir. 1999).  Here, plaintiff never
demonstrated a connection between the September 2000 events which
lead him to go onto disability, and the surgeries occurring in
2002.  It would be inappropriate for the court to require PMA to
credit Dr. Bendy's retrospective statement as to when plaintiff's
cervical pain began without any supporting evidence. Similarly,
under Elliot, plaintiff's attempts to switch the burden to
defendant to justify the reasonableness of its decision in light
of the absence of medical evidence in the record must fail. (See
Doc. No. 20 at 14-16.)  Even allowing for the slightly more
plaintiff-favoring standard appropriate to this case, plaintiff
cannot win as PMA's decision was entirely

-11-

reasonable.  As such, the court explicitly rejects plaintiff's bases for relief contained in Counts I and III of the Complaint.

The second count of the complaint is premised on the notion that PMA acted inappropriately when it decided his case before "the extension" it granted him had run.  (See Doc. No. 20 at 11.) However, as the court noted in its summary of the facts of this case, the letter plaintiff indicates contains an exception actually states the latest date at which PMA's decision will be reached.  (See R. at 219.)  As defendant notes, regulations promulgated under ERISA require that plans notify claimants of final decisions on appeal no later than forty-five days after a claim is received.  See 29 C.F.R. § 2560.503-1(i)(1)(I), (3)(i). The letter to plaintiff only was intended to explain why plaintiff's decision was late and to give him notice that certain evidence had not, as yet, been received, and was not intended to grant him an affirmative right to new time.  As such, this argument must also be rejected, and defendant's motion for summary judgment as to Count II of the Complaint must also be granted.[2]

_____

[2]  As the court notes elsewhere in this opinion, none of the evidence plaintiff provided within the period he claims PMA provided him related the injuries requiring surgery in 2002 back to the time when he was covered in 2000.  As such, even if PMA acted inappropriately here, any error was harmless.  As defendant notes in its brief, the remedy for any error caused in timing would be for the court to remand this case back to PMA for further review.  (See Doc. No. 27 at 6) (listing cases).

Because the court finds that plaintiff did not present adequate evidence to PMA showing a connection between the September 2000 attack, during the period when he was covered by the Policy, and his 2002 surgery, PMA's decision making process was reasonable.  Additionally, having reviewed the case law as well as applicable statutory and regulatory law, the court finds no evidence that PMA's decision making process was procedurally unfair.

Because the court accepts defendant's arguments regarding all three counts of the Complaint, defendant's motion for summary judgment must be granted, and plaintiff's motion for summary judgment must be denied.

**IV.  Defendant's Motion for Summary Judgment on Its Counterclaim**

PMA has also moved for summary judgment on a counterclaim filed in this case seeking reimbursement for overpayments occurring under the Policy.  Specifically, PMA notes that the Policy provides that the gross amount of disability benefits, based on the participant's pre-disability compensation, is to be reduced by payments to the participant under the United States Social Security Act.  (<u>See</u> Doc. No. 22 at 2) (discussing R. at 392.)

### A.  Factual Background

PMA notes that, on or about March 19, 2001, it began paying plaintiff monthly long-term disability benefits in an amount of

$2,641.06 per month.  On or about July 19, 2002, plaintiff executed a Long Term Disability Payment Option form, on which he elected to receive PMA disability benefits with no reduction for estimated Social Security Disability Income ("SSDI") benefits pending a decision by the Social Security Administration on his SSDI request.  The form stated, "This may result in an overpayment by [PMA].  You must supply [PMA] with a copy of the Social Security decision and repay any overpayment."  PMA paid these benefits for two years, and terminated his benefits pursuant to Policy provisions as of March 18, 2003.  (See R. at 1-15, 125-28.)  During this two-year period, PMA payed plaintiff a total of $55,462.26.

On or about April 20, 2003, plaintiff was notified that he had been awarded SSDI benefits retroactively to July 2001.  For the initial period July 2001 through November 2001, plaintiff's monthly SSDI benefit was $1,123.40.  SSDI benefits overlapped with payments of disability benefits under the Policy from July 1, 2001, through March 18, 2003, a total of twenty months and eighteen days.  As a result of this overlapping of payments, defendant contends that benefits paid to plaintiff exceeded the amounts to which he was entitled under the Policy's terms.

PMA calculated the overpayment by subtracting SSDI benefits for each specific monthly period from Plan benefits for the same period and adding up the differences.  (See R. at 221.)  Based on

-14-

plaintiff's initial monthly SSDI award, the total overpayment was $23,133.80.  Although PMA made a demand for reimbursement of the overpayment, it indicates that plaintiff never made any payments.  (See R. 220-21; Doc. No. 12 ¶ 10.)

### B.  Analysis

#### 1.  Legal Background

PMA brings this counterclaim under § 502(a)(3) of ERISA, which authorizes awards of "appropriate equitable relief" to redress violations of plan terms or of the statute.  See 29 U.S.C. § 1132(a)(1)(B).  "Equitable relief," for this purpose, encompasses categories of remedies that were "typically available in equity" in the days of the divided bench.  See Sereboff v. Mid Atl. Med. Servs., Inc., No. 05-260, 2006 U.S. LEXIS 3954, at *11-13 (U.S. May 15, 2006) (discussing, and distinguishing Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 214-15 (2002), on the grounds that the funds at issue in that case were not in possession of the actual person, but instead were held by a special-needs trust).  In Sereboff, the Court upheld an equitable lien on $74,869.37 of a $750,000.00 tort judgment to account for a plan's payment of certain medical expenses pursuant to the plan's terms.  See id. at *8-10.

#### 2.  PMA's Motion for Summary Judgment

In its motion for summary judgment on its counterclaim, PMA seeks recovery on behalf of the Plan on overpayments made to

plaintiff.  (<u>See</u> Doc. No. 24 at 3.)  Specifically, PMA seeks the
imposition of a constructive trust on future SSDI payments to
plaintiff to the extent necessary to extinguish the overpayment
and an order directing plaintiff to restore such sums to the
Plan.  (<u>Id.</u>)

In response, plaintiff contends that equitable relief is
inappropriate in this case for a number of reasons.  (<u>See</u> Doc.
No. 25 at 4-8.)  First, plaintiff contends that, because the
source of PMA's claim is a contract to pay money, the application
of a constructive trust here would be inappropriate.  (<u>Id.</u> at 5)
(citing <u>Eldridge v. Wachovia Corp. Long-Term Disability Plan</u>, 383
F. Supp. 2d 1367 (N.D. Ga. 2005) and <u>Qualchoice, Inc. v. Rowland</u>,
367 F.3d 638 (6th Cir. 2004)).  Second, plaintiff notes that his
SSDI funds are not "specifically identifiable" as is required for
the application of a constructive trust, and the funds are not,
as yet, in plaintiff's possession.  (<u>Id.</u> at 6.)  Plaintiff notes
that "the courts [discussing the relevant section of ERISA] talk
about particular funds or property *in the defendant's
possession*."  (<u>Id.</u>) (citing <u>Knudson</u>, 534 U.S. 204; and <u>Mid Atl.
Med. Servs., LLC v. Sereboff</u>, 407 F.3d 212, 212 (4th Cir.
2005)).[3]  Finally, plaintiff notes that the SSDI benefits are his

---

[3]  The Supreme Court's <u>Sereboff</u> decision came down after
briefing had concluded regarding PMA's counterclaim.  As such,
the precedential weight of some of the cases the parties have
relied on has become significantly altered.  However, given that
the court denies the counterclaim for reasons outside of the

only source of income, and that these benefits "quickly dissipate[] to pay [plaintiff's] monthly living expenses, i.e. mortgage payments, vehicle payments, groceries, and utilities, etc." (Id. at 7.)  The court examines these arguments in turn.

In light of the Sereboff decision, plaintiff's first and second arguments in response to PMA's motion for summary judgment are without merit.  In Sereboff, the court indicates that an equitable claim under § 502(a)(3) can be had even where future funds are at issue.  See id. at *15-16 (recounting Justice Holmes' statement in Barnes v. Alexander, 232 U.S. 117, 121 (1914), that "the familiar rule in equity that a contract to convey a specific object even before it is acquired will make the contractor a trustee as soon as he gets a title to a thing.").  This obviates plaintiff's attempted "no equity based on a contract" distinction.  Further, in that Sereboff also involves money, something that by nature is fungible and not specifically identifiable, plaintiff's second argument must also fail.  Sereboff also undercuts much of the case law support for plaintiff's third argument, as it effectively overrules Eldridge, 383 F. Supp. 2d at 1367, and Qualchoice, 367 F.3d at 638, upon which it relies.[4]

_____

briefing entirely, no additional briefing on the status of the case post-Sereboff would likely be helpful.

[4]  In the interest of judicial economy, the court hereby declines to provide extensive analysis on plaintiff's third

### 3.  Application of 42 U.S.C. § 407

While on the pleadings filed by the parties it might be proper to grant PMA's motion for summary judgment on its counterclaim, the Social Security Act itself prohibits the equitable assignment of disability benefits.  42 U.S.C. § 407 provides that

> (a) The right of any person to future payment under this title shall not be transferrable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this title shall be subject to execution, levy, attachment, garnishment, or other legal process . . . .

> (b) No other provision of law, enacted before, on, or after the date of this section, may be construed to limit, supersede, or otherwise modify the provisions of this section except to the extent that it does so by express reference to this section . . . .

While it is clear that a pension plan such as PMA is permitted to reduce payments to persons by a percentage of the amount of Social Security benefits received by them, this section (a) of this statute explicitly prohibits the equitable action PMA now seeks.  See, e.g., Hurd v. Illinois Bell Tel. Co., 234 F.2d 942, 946 (7th Cir. 1956) ("[T]he policy . . . written into the plan requiring the deduction of one-half of OASI benefits from the private payments violates neither the letter nor the spirit

---

argument in light of its application of 42 U.S.C. § 407, as this statute bars PMA's claims.

of the Social Security Act."). Plaintiff was not able to transfer a right to his future SSDI benefits to PMA. This court is not permitted under the statute to place these benefits in any kind of constructive trust. Because the statute bars the relief PMA requests in absolute terms, PMA's counterclaim must be denied. Additionally, in the accompanying Judgment Order, PMA's counterclaim is dismissed in its entirety.

### V. Conclusion

For the reasons outlined above, defendant's motion for summary judgment is granted and plaintiff's motion for summary judgment is denied. Further, defendant's motion for summary judgment regarding its counterclaim is denied. The Clerk is directed to strike this case from the active docket of the court.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is SO ORDERED this 22nd day of May, 2006.

ENTER:

David A. Faber
Chief Judge

-19-